70-08/PJG

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
Associated Bulk Carriers Ltd.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
INDUSTRIAL CARRIERS INC.,

                          Plaintiff,

        -against-

ASSOCIATED BULK CARRIERS LTD.,

                          Defendant.
----------------------------------------------------x

08 CV 0575 (VM)

**GUTOWSKI AFFIDAVIT
IN SUPPORT OF MOTION
FOR COUNTER-SECURITY**

PETER J. GUTOWSKI, an attorney at law, affirms and states as follows:

1.  I am an attorney admitted to practice before this Court and am a partner with Freehill Hogan & Mahar, LLP, attorneys for Defendant ASSOCIATED BULK CARRIERS LTD. ("Associated Bulk"). I submit this Affidavit in support of Associated Bulk's application for an Order directing Plaintiff INDUSTRIAL CARRIERS INC. ("Industrial Carriers") to provide counter-security for Associated Bulk's counterclaims.

2.  The following background facts are not in dispute.

3.  Pursuant to a charter party dated November 23, 2007 the Defendant Associated Bulk in the capacity as "Owner", chartered the M/V SOUTHGATE to the Plaintiff Industrial Carriers, for a period of up to 125 days within international navigating limits. (*See* Ex. 1, copy of Plaintiff's Verified Complaint at ¶4 and Ex. 2, copy of Charter Party).

NYDOCS1/301438.1

4.  During the performance of the contract, disputes have arisen between the parties some of which are the subject of proceedings in the English High Court under the terms of the contract. (*See* Ex. 1, Verified Complaint at ¶8 confirming Charter Party contract provides for all disputes to be submitted to the High Court of Justice in England with English Law to apply.)

5.  The Plaintiff, Industrial Carriers, commenced this action earlier this year and sought an attachment for the principal sum of its claims (i.e. $9,530.79), together with (i) an allowance for interest (6% for three years) and (ii) an estimated attorney fee and arbitration costs component equal to 52% of its principal claim. (*See* Ex. 1 at ¶10).

6.  An attachment was subsequently issued and security in the full amount sought (i.e. $16,353.14) was provided. (See, Ex. 3 hereto, confirmation of establishment of escrow fund in the sum provided for in the Process of Attachment, providing Plaintiff full security for its claims.)

7.  For its part, the Defendant Associated Bulk has a sizeable counter-claim against the Plaintiff arising out of the same contract, which claim is being asserted in the English High Court proceedings between the parties. The claim primarily involves an improper and unauthorized deduction taken by the Plaintiff Industrial Carriers for a period of alleged off-hire.

8.  That claim, together with some minor end of charter discrepancies, resulted in a balance being due from Plaintiff to the Defendant Associated Bulk of $302,749.45. (*See* Ex. 4, Final Hire Statement showing principal balance due of $302,749.45).

9.  As outlined in the accompanying Declaration from Associated Bulk's UK solicitor, Ben Moon, the claim presents a viable, and supportable claim under English law

for the sums sought, and interest, legal fees and costs will be awarded to the prevailing party and form a part of the recoverable claim for damages. (*See* accompanying Moon Declaration.)

10. To the extent the Plaintiff sought and obtained an attachment which included interest, costs and attorneys' fees, that same Plaintiff should not be permitted to artificially limit the reciprocal rights of the Defendant in obtaining counter-security for its claims.

11. Utilizing the same interest calculation put forward by the Plaintiff in its Verified Complaint (i.e. 6% for 3 years), counter-security from the Plaintiff should include an interest component of $54,494,82 (principal amount of claim of $302,749 x 6% x 3 years).

12. In addition, the Defendant Associated Bulk, like the Plaintiff, should receive security for its anticipated legal fees and costs in the English High Court proceedings, estimated conservatively at approximately $145,000, as per the Moon Declaration.

13. In its application, the Plaintiff sought and was granted a legal fee allocation equal to approximately 54% of its claim. While the Defendant recognizes that in some instances, the size of the claim does not necessarily, or accurately for that matter, dictate the extent of anticipated legal fees and costs that will be incurred, the accompanying Declaration from English counsel verifies the appropriateness of an order for counter security at the $502,243.82 level.

14. As discussed therein, the dispute which will be addressed will likely involve defense of the Plaintiff's alleged claims and questions of off hire subsequent to the

- 4 -

grounding of the vessel, and as a consequence, the legal fees and costs incurred in litigating these items could be relatively sizeable.

15. Based upon the foregoing, and for the reasons set forth in the accompanying Memorandum of Law, the Defendant Associated Bulk seeks an Order compelling the Plaintiff to provide counter-security in a form similar to that posted or otherwise suitable to the Court in the form of either a cash deposit or a bond in the sum of $502,243.82.

_____
Peter J. Gutowski (PG 2200)

Sworn to before me this
28th day of March, 2008

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

# Ex. 1

JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

INDUSTRIAL CARRIERS INC.,                        :

08 CV 0575

                              Plaintiff,          :

                                                          07 CV _____
          - against -                             :       ECF CASE

ASSOCIATED BULK CARRIERS LTD.,    :

                              Defendant.          :
-------------------------------------------------------X

JAN 2 3 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, INDUSTRIAL CARRIERS INC. (hereinafter referred to as "Plaintiff" or

"ICI"), by and through its attorneys, Tisdale Law Offices LLC, as and for its Verified Complaint

against the Defendant, ASSOCIATED BULK CARRIERS LTD., (hereinafter referred to as

"Defendant" or "ABC"), alleges, upon information and belief, as follows:

      1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

      2.     At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized under and existing by virtue of foreign law with a registered address in Majuro,

Marshall Islands.

      3.     Upon information and belief, Defendant was, and still is, a foreign corporation or

other business entity organized under and existing by virtue of foreign law with a principal place

of business in London.

      4.     By a time charter party dated November 23, 2007, the Plaintiff chartered the "MV

SOUTHGATE" from the Defendant for a time charter trip within International Navigating

Limits.

5.      Certain disputes arose between the parties after the Plaintiff over-paid hire and the Defendant refused to return the over-payment in breach of the charter party contract.

6.      As a result of Defendant's breaches the charter party contract, Plaintiff has suffered damages in the principal amount of $9,530.79.·

7.      Despite due demand, Defendant has failed to pay the sums due and owing as a result of its breaches of the contract.

8.      The contract provides that any disputes arising thereunder shall be referred to London Arbitration with English law to apply.

9.      Plaintiff will soon commence arbitration and appoint its arbitrator in accordance with the charter party.

10.      Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London Arbitration.  As best as can now be estimated, Plaintiff expects to recover the following amounts:

|   |   |   |
|---|---|---|
| A. | Principal claim: | $9,530.79 |
| B. | Estimated interest on claims:<br>3 years at 6.0% | $1,822.35 |
| C. | Estimated attorneys' fees: | $5,000.00 |
| **Total** | | **$16,353.14** |

11.      The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

2

12.    The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant, to compel arbitration and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint, failing which default judgment be entered against it in the sum of **$16,353.14**.

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$16,353.14** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishee(s) to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That pursuant to 9 U.S.C. §§201 et seq. this Court recognize and confirm any

London arbitration award in Plaintiff's favor against the Defendant as a judgment of this Court;

D.    That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

E.    That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: January 23, 2008
      New York, NY

                    The Plaintiff,
                    INDUSTRIAL CARRIERS INC.,

By: _____
                    Lauren C. Davies (LD 1980)
                    Thomas L. Tisdale (TT 5263)
                    TISDALE LAW OFFICES LLC
                    11 West 42nd Street, Suite 900
                    New York, NY 10036
                    (212) 354-0025 – phone
                    (212) 869-0067 – fax
                    ldavies@tisdale-law.com
                    ttisdale@tisdale-law.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
        )   ss.:   City of Southport
County of Fairfield )

  1.   My name is Lauren C. Davies.

  2.   I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

  3.   I am an Associate in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff.

  4.   I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

  5.   The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

  6.   The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

  7.   I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    January 23, 2008
     Southport, CT

           _____
           Lauren C. Davies

Ex. 2



**GREYSTONE SHIPPING LTD.**
Shipbrokers
14th Floor. York House. Empire Way, Wembley, Middlesex HA9 0PA (U.K.)
Tel: 020 8795 5002  Fax: 020 8795 5003
Emails  handy@greystoneshipping.co.uk
panamax@greystoneshipping.co.uk

# Time Charter

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**ORIGINAL**

1  **This Charter Party**, made and concluded in ............London ....................................23rd ...... day of *November 2007*............... 19....
2  Between *Associated Bulk Carriers Limited, London* ................................................................................................
3  Owners of the good .....*Liberian Flag*.................... Steamship/Motorship....*Southgate*.......................................................... of .........................
4  of ...................................... tons gross register, and ................................... tons net register, having engines of .........................indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed at .................................................................
6  at .................... of about ........... cubic feet bale capacity, and about ..................... tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of ............................ feet metres ...... inches on *salt water* Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about.................................................tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about ............................ knots on a consumption of about ......................... tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,
11  now *and as further described as per Clause 62* ...........................................................................................................
12  ........................................................................ and *Industrial Carriers Inc.* ....................... Charterers of the City of .. *Majuro, Marshall Islands*

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  about *two/three laden legs in Charterer's option via safe port(s), safe berth(s), safe anchorage(s) always afloat, always within* .......
15  *International Navigating Limits up to max 125 days* ................................within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party.
18  Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Tin Can Island (Lagos) any time day night*
19  *Sundays and holidays included* ...................................................................................................................
20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on *arrival first loadport* her delivery to be
22  ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the *ordinary cargo* service, having water ballast, winches and
23  donkey boiler with sufficient steam-power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of *competent and certificated* officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, including petroleum of its products, in proper containers, excluding ..................*see Clause 69* .......................................
26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29  Mexico, and/or South America.....................................................................................................................and/or Europe
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,
32  *The vessel shall trade in any part of the world within International Navigating Limits*............................................................
33  ..............*(See Clause 36 and Clause 68)*..............................................................................................................
34  .........................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:
36  1.    That the Owners shall provide and pay for all provisions, *garbage removal requested by Master,*  wages and consular shipping and discharging fees of the Crew; shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *fresh and* boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.
39  2.    That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary* Pilotages, Agencies, Commissions,
40  Consular Charges (except those pertaining to the Crew), and other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48  3.    That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than...........................tons and not more than
50  ...........................tons and to be re-delivered with not less than...........................tons and not more than...........................tons.
51  4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of ...........................*USD 37.000 (thirty-seven thousand*
52  *United States Dollars) daily including overtime* United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, on...........................................summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a *day* ~~month~~; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) ~~at~~ *on redelivery dropping last outward sea pilot safe port  Charterer's option within*
56 *Skaw/Canakkale range (if last discharging port in Adriatic then redel passing Brindisi – if last discharging port in the*
*Mediterranean is east of Canakkale then redely on passing Canakkale Meridian Westbound). Norfolk/Bahia Blanca range*
*including USG/Gulf of Mexico ,North Coast South America and Caribbeans ,Gibraltar/South Africa.* unless otherwise mutually
agreed. ~~Charterers are to give Owners not less than~~ ................................................................................................................................................
57 ~~notice of vessels expected date of re-delivery, and probable port.~~ ........................................................................................................................ .days
58     5.    Payment of said hire to be made *to Owners as per Clause 66* ~~in New York~~ in cash in United States Currency, ~~semi-monthly~~ *every 15 days in*
59 *advance,* and for the last half month or
59     part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61 hire, or bank guarantee, or ~~on~~ *any repudiatory* breach of this Charter Party,   *subject to Clause 43*  the Owners shall be at liberty to withdraw the vessel
from the service of the Char-
62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~
65     Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.
68     6.    That the cargo or cargoes be laden and/or discharged in any dock or at any wharf ~~or place~~ that Charterers or their Agents may
69 direct, ~~provided~~ *Charterers to exercise due diligence before directing the vessel to any such places ascertain that* the vessel can safely lie
70 always afloat ~~at any time of tide, except at such places where it is customary for similar size vessels to safely~~ lie aground.
71     7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel *no passenger allowed, no deck cargo.* ~~Charterers have the privilege of passengers as far as~~
~~accommodations allow, Charterers~~
74 ~~paying Owners~~...............................................~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~
76     8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of
Lading for
79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *Master will authorize in writing Charterers or their Agents to sign Bills*
*of Lading on his behalf always in accordance with Mates receipts. Such authority will be given as per provided wording (see*
*attachment).*
80     9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82     10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of ~~$1.00~~ *USD 10.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85 Clerks, Stevedore's Foreman, etc., *cost for Victualling/Cables/Entertainment to be USD 1,250.00 (one thousand two hundred and fifty*
*U.S. Dollars) per month pro rata.* ~~Charterers paying at the current rate per meal, for all such victualling.~~
86     11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89 sumption of fuel.
90     12.    That the Captain shall use diligence in caring for the ventilation of the cargo *by natural ventilation, weather permitted.*
91     13.    ~~That the Charterers shall have the option of continuing this charter for a further period of.~~.....................................................................
92 .........................................................................................................................................................................................................................
93 ~~on giving written notice thereof to the Owners or their Agents~~..............................~~days previous to the expiration of the first-named term, or any declared option.~~
94     14.    That if required by Charterers, time not to commence before ...~~00.01 hours of the 1st December 2007~~............................. and should vessel
95 not have *been delivered* ~~given written notice of readiness~~ on or before *23.59 hrs of the 7th  December 2007* ... ~~but not later than 4 p.m.~~ Charterers or
96 their Agents to have the option of cancelling this Charter ~~at any time not later than the day of vessel's readiness.~~ *Eta Lagos 26th November to discharge*
*21500 BLk wheat/etc 1st December all going well*
97     15.    That in the event of the loss of time from deficiency of ~~men or~~  *Master, Officers or Crew, or deficiency* stores, fire, breakdown or damages
to hull, machinery or equipment,
98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all *direct* extra expenses shall be deducted from the hire.
102     16.    ~~That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be~~
103 ~~returned to the Charterers at once.~~ The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107     17.    ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110     18.  That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114     19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules *1974 as amended 1990 in London, English Law to apply.* ~~1924, at such port or place in the United States as may be selected~~
~~by the carrier, and as to matters not provided for by these~~
117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~
132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *See Clause 58 - hire and*
*bunkers not to contribute to General Average.*
133     20.  Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.
135     21.  ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 .................................................................................................................................................................................................
139 .................................................................................................................................................................................................
140     22.  Owners shall maintain the gear of the ship as fitted, ~~providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel lanterns and oil for
143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144 Charterers to have the use of any gear on board the vessel.
145     23.  ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~
151     24.  ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155 ~~U. S. A. Clause Paramount~~
156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160 ~~Both to Blame Collision Clause~~
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167     25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170     26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners remain responsible for the
171 navigation of the vessel, *acts of Pilots and/or Tug Boats,* insurance, crew, and all other matters, same as when trading for their own account.
172     27.  A commission of ~~2 1/2~~ *1.25* per cent is payable by the Vessel and Owners to
173 ............................................................*Greystone Shipping Ltd. London.*.................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175     28.  An address commission of ~~2 1/2~~ *3.75* per cent payable to ...............*Diamant Co. Ltd. Odessa* on the hire earned and paid under this Charter.
*Additional Clauses 29 to 81 plus Master Letter of Authority to be incorporated in this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY
## MV "SOUTHGATE"
## DATED 23RD NOVEMBER 2007

**CLAUSE 29:**
OWNERS TO GIVE CHARTERERS 3,2,1 (THREE, TWO, ONE) DAY NOTICE OF ESTIMATED
DATE THE VESSEL WILL BE READY FOR THIS CHARTER.

**CLAUSE 30:**
ON HIRE SURVEY TO BE HELD IN CHARTERERS TIME AT FIRST LOAD PORT AND OFF
HIRE BUNKERS SURVEY TO BE HELD IN OWNERS TIME AT LAST DISCHARGING PORT
BEFORE REDELIVERY, HOWEVER ONLY TIME LOST TO BE DEDUCTED FROM
HIRE.EXPENSES FOR ON/OFF HIRE SURVEYS TO BE EQUALLY SHARED 50/50 BETWEEN
OWNERS/CHARTERERS UNLESS MASTER ATTENDS ON OWNERS BEHALF WHEN ALL
EXPENSES TO BE FOR CHARTERERS ACCOUNT.

**CLAUSE 31:**
THE VESSEL TO BE DELIVERED AND REDELIVERED WITH BUNKERS AS ON BOARD AS
PER CLAUSE 67. CHARTERERS ON DELIVERY AND OWNERS ON REDELIVERY TO HAVE
THE OPTION TO BUNKER THE VESSEL ON THEIR OWN ACCOUNT PROVIDED SUCH
BUNKERING SHALL NOT INTERFERE WITH CARGO OPERATIONS.

**CLAUSE 32:**
THE VESSEL IS WARRANTED TO BE A SELFTRIMMING BULK CARRIER FOR A FULL
CARGO OF FREE FLOWING MATERIAL. THE VESSEL TO BE SUITABLE FOR GRAB
DISCHARGE AND NO CARGO TO BE LOADED IN PLACES INACCESSIBLE FOR GRAB
DISCHARGE OR IN DEEP TANKS.ANY TIME LOST OWING TO CARGO BEEING LOADED IN
SUCH INACCESSIBLE PLACES TO BE CONSIDERED OFF-HIRE, AND ANY ADDITIONAL
DISCHARGING COSTS TO BE FOR OWNERS' ACCOUNT, PROVIDED ALWAYS
CONSISTENT WITH VESSEL'S TANKTOP STRENGTHS. CHARTERERS TO HAVE THE
PRIVILEGE TO USE BULLDOZERS WITH RUBBER TRACKS OR TYRES IN THE HOLDS.

**CLAUSE 33:**
VESSEL ON ARRIVAL FIRST LOADPORT TO PRESENT WITH ALL HOLDS IN GRAIN
CLEAN CONDITION , FRESH WATER WASHED , DRY CLEAN AND FREE FROM LOOSE
RUST TO RELEVANT INDEPENDENT SURVEYORS SATISFACTION (PRESENT CARGO
BLK WHEAT LOADED IN USA).
IF THE VESSEL ON ARRIVAL FIRST LOADPORT IS REJECTED OWING TO HOLD
CLEANLINESS, OWNERS TO UNDERTAKE THE NECESSARY CLEANING TO SURVEYOR'S
SATISFACTION FOR OWNERS'ACCOUNT AND TIME.
CHARTERERS'OPTION TO REDELIVER VESSEL UNCLEAN PAYING US$ 3,500.00 AFTER
GRAIN OR US$ 5,000.00 AFTER ALL OTHER PERMITTED CARGOES AND IN CASE
PETCOKE LAST CARGO THEN CHARTERERS TO PAY US$ 12,500.00 IN LIEU OF HOLD
CLEANING.

INTERMEDIATE HOLD CLEANING

1)THE CHARTERER SHALL PROVIDE AND PAY EXTRA FOR INTERMEDIATE
HOLD CLEANING BETWEEN VOYAGES PROVIDED SUCH WORK CAN BE
UNDERTAKEN BY CREW AND IS PERMITTED BY LOCAL REGULATIONS AT THE
RATE OF USD400 PER HOLD AFTER GRAIN OR USD500 AFTER ALL OTHERS.
2)SUCH CLEANING TO BE PERFORMED WHILE THE VESSEL IS EN ROUTE TO
THE NEXT LOADING PORT ALWAYS PROVIDED THAT THIS CAN BE SAFELY
DONE, WEATHER PERMITTING SAME,AND THAT THE DURATION OF THE VOYAGE
IS SUFFICIENT TO ALLOW THE TASK TO BE COMPLETED. IN CONNECTION
WITH ANY SUCH OPERATION, THE OWNERS SHALL NOT IN ANY WAY BE

1

**ADDITIONAL CLAUSES TO THE CHARTER PARTY**
**MV "SOUTHGATE"**
**DATED 23RD NOVEMBER 2007**

**CLAUSE 33:(cont)**

RESPONSIBLE IF THE VSLS HOLDS ARE NOT ACCEPTED OR PASSED FOR THE
NEXT CARGO AND ALL TIME LOST OR EXPENSES INCURRED AS A RESULT OF
ANY FAILURE SHALL BE FOR CHRTRS ACCOUNT.

3) IT IS ALSO UNDERSTOOD THAT ANY FRESH WATER AND/OR CHEMICALS
REQUIRED BY THE VSL TO CARRY OUT SUCH CLEANING TO BE SUPPLIED
TO THE VESSEL AT CHARTERERS' TIME/ EXPENSE.

4) THROUGHOUT THE CURRECY OF THIS C/P AND AT REDELIVERY,THE
CHARTERERS SHALL REMAIN RESPONSIBLE FOR ALL COSTS AND TIME
ASSOCIATED WITH THE REMOVAL AND DISPOSAL OF CARGO RELATED
RESIDUES AND/OR HOLD WASHING WATER AND/OR
CHEMICALS/DETERGENTS/WASTE AS DEFINED BY MARPOL annex v
section 1 OR OTHER APPLICABLE RULES RELATING TO THE DISPOSAL OF
SUCH SUBSTANCES.

5) CHTRTS ARE AWARE THAT SHOULD LOCAL REGULATIONS REQUIRE THAT
CARGO HOLD WASHINGS BE RETAINED ON BOARD THE VSL FOR LATER
DISPOSAL THEN THE VSL'S CONSTANTS WILL INCREASE ACCORDINGLY.

**CLAUSE 34:**

WITHOUT PREJUDICE TO THE GENERALITY OF OWNERS' OBLIGATIONS SET OUT IN
THIS CHARTER THE VESSEL WILL COMPLY WITH ANY SAFETY REGULATIONS AND/OR
REQUIREMENTS IN EFFECT AT PORTS OF LOADING AND/OR DISCHARGING, A
PARTICULAR REFERENCE IN THE UNITED STATES DEPARTMENT OF LABOUR SAFETY
AND HEALTH REGULATIONS SET FORTH IN PART III OF THE FEDERAL REGISTER, OR
ANY NEW REGULATIONS WHICH MAY FROM TIME TO TIME COME INTO FORCE
REPLACING SAME. ALTHOUGH OTHER PROVISIONS OF THIS CHARTER MAKES IT THE
RESPONSIBILITY OF OWNERS, IT IS AGREED THAT SHOULD THE VESSEL NOT MEET
THESE SAFETY RULES AND REGULATIONS, OWNERS WILL MAKE IMMEDIATE
CORRECTIVE MEASURES AND ANY STEVEDORES STANDBY TIME AND OTHER DIRECT
EXPENSES INVOLVED, INCLUDING OFF-HIRE, WILL BE FOR OWNERS'ACCOUNT.

**CLAUSE 35:**
WEST COAST GEAR CLAUSE

OWNERS WARRANT THAT VESSELS CARGO GEAR IS IN CLASS AND WILL
REMAIN SO THROUGHOUT THE CURRENCY OF THIS CHARTER. IN CASE
VESSEL LOADS OR DISCHARGES IN U.S. WEST COAST PORTS OWNERS
WILL NOT BE RESPONSIBLE FOR THE CONDITION OF THE VESSELS
GEAR. ALL EXPENSES AND ANY LOSS OF TIME RELATED TO THE
CONDITION OF THE VSLS CARGO GEAR TO BE FOR CHTRTS ACCOUNT.

**CLAUSE 36:**
THROUGHOUT THE PERIOD OF THE CHARTER, THE VESSEL SHALL HAVE ON BOARD
CURRENT VALID PANAMA AND SUEZ CANAL MEASUREMENT CERTIFICATES AND WILL
COMPLY WITH ALL APPLICABLE REQUIREMENTS, REGULATIONS AND
RECOMMENDATIONS SO AS TO AVOID ANY DELAY IN TRANSIT OF THESE CANALS.

2

ADDITIONAL CLAUSES TO THE CHARTER PARTY
MV "SOUTHGATE"
DATED 23RD NOVEMBER 2007

**CLAUSE 37:**
THE VESSEL HAS NEVER CALLED CUBA. OWNERS GUARANTEE THAT THE VESSEL IS
NOT BLACKLISTED BY THE INTERNATIONAL LONGSHOREMEN ASSOCIATIONS OR ANY
ARAB COUNTRY NOR ANY LOCAL UNIONS DUE TO PREVIOUS TRADE. THE VESSEL HAS
NOT CALLED AT ANY SIBERIAN OR EAST RUSSIAN PORT SINCE MARCH 1991.

**CLAUSE 38:**
OWNERS WARRANT THAT AT THE TIME THE VESSEL IS PLACED AT CHARTERERS'
DISPOSAL, THE VESSEL SHALL FULFIL THE DESCRIPTION, PARTICULARS AND
CAPABILITIES SET FORTH IN THIS CHARTER, AND SHALL BE TIGHT, STAUNCH AND
STRONG, IN THOROUGHLY EFFICIENT ORDER AND CONDITION AND IN EVERY WAY
FIT, MANNED, EQUIPPED AND SUPPLIED FOR THE SERVICE CONTEMPLATED. SUCH
DESCRIPTION, PARTICULARS, CAPABILITIES AND CONDITION OF THE VESSEL TO BE
MAINTAINED BY OWNERS THROUGHOUT THE PERIOD OF THE VESSEL'S SERVICE
HEREUNDER, PERILS OF THE SEA EXCEPTED.

**CLAUSE 39:**
DELETED

**CLAUSE 40:**
CHARTERERS HAVE THE OPTION TO LIGHTEN OR TOP-OFF THE VESSEL, AND IF SUCH
OPTION IS EXERCISED, THE VESSEL WILL PROCEED TO A SAFE ANCHORAGE AS
DIRECTED BY CHARTERERS AND THERE LIGHTEN OR TOP-OFF AS ORDERED. MASTER
WILL CO-OPERATE WITH REGARD TO THE SECURING TOGETHER TWO THE VESSELS
AT ANCHORAGE.AT ALL TIMES DURING THIS MANOEUVRE AND TOP-OFF AND/OR
LIGHTENING, OPERATIONS SHALL BE UNDER THE DIRECTIONS OF THE MASTER
AND/OR PILOT OF THE LIGHTENING/TOP-OFF VESSEL. ANY DAMAGE AND/OR LOSS OF
TIME SUFFERED BY THE VESSEL DURING EITHER SECURING TOGETHER OR CASTING
OFF FROM THE LIGHTENING/TOP-OFF VESSEL OR DURING TOP-OFF AND/OR
LIGHTENING OPERATION SHALL BE AT CHARTERERS'EXPENSE.THE ABOVE
OPERATION WILL BE MADE TO OR FROM A SUITABLE VESSEL AND/OR OTHER
SUITABLE VESSELS, EQUIPPED WITH THE NECESSARY SUITABLE FENDERS AND
DISCHARGING GEAR.ABOVE OPERATIONS ARE AT MASTER'S DISCRETION AS TO
SAFETY.
CHARTERERS HAVE THE PRIVILEGE TO DOUBLE-BANK THE VESSEL ONLY IN SUCH
PLACE WITHIN TRADING LIMITS, WHERE SUCH FACILITIES EXIST IN THE CUSTOMARY
LIGHTERAGE AREAS AND SAME IS CUSTOMARY FOR SIMILAR SIZE VESSEL FOR
LOADING AND/OR DISCHARGING AT CHARTERERS' RISK/EXPENSES/TIME.

THE CHARTERERS SHALL INDEMNIFY THE OWNERS FOR ANY COSTS, DAMAGES AND
LIABILITIES RESULTING FROM SUCH OPERATION.THE VESSELL SHALL REMAIN ON
HIRE FOR ANY TIME LOST INCLUDING PERIODS FOR REPAIRS AS RESULT OF SUCH
OPERATION.
MASTER/CREW TO GIVE EVERY FACILITY/COOPERATION IN LINE WITH NORMAL
SHIPPING PRACTICE. MASTER ALSO HAS THE RIGHT AT ANY TIME TO ORDER VESSEL
TO SAIL IF HE CONSIDERS IT UNSAFE FOR VESSEL TO REMAIN DOUBLE-BANKED.
ANY ADDITIONAL FENDERS REQUIRED FOR DOUBLE-BANKING TO BE PROVIDED AND
PAID FOR BY CHARTERERS.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY
## MV "SOUTHGATE"
## DATED 23RD NOVEMBER 2007

**CLAUSE 41:**
STEVEDORE DAMAGE.

ANY DAMAGE TO THE VESSEL CASUED BY STEVEDORES OR SHORE WORKERS DURING THE CURRENCY OF THIS CHARTER TO BE THE RESPONSIBILTY OF THE CHARTERERS SUBJECT TO THE VESSEL INFORMING THE CHARTERERS OR THEIR AGENTS WITHIN 24 HRS OF DISCOVERY. THE MASTER TO ENDEVOUR TO OBTAIN THE WRITTEN ACKNOWLEDGEMENT OF THE DAMAMGE FROM THE STEVEDORES AND OR OTHER PARTIES WHO WILL BE REQUESTED TO MAKE GOOD THE DAMAGE, TO THE MASTERS SATISFACTION, PRIOR TO THE VSLS DEPARTURE

FROM THE PORT OF OCCURENCE. IN THE EVENT THE STEVEDORES AND OR OTHER PARTIES REFUSE TO CARRY OUT THE REPAIRS,OR IF THERE IS INSUFFICIENT TIME TO CARRY OUT SUCH REPAIRS, THEN THE REPAIRS CAN BE DEFERRED FOR OWNERS ARRANGEMENTS EITHER BY THE CREW OR SHORE REPAIRERS AT THE NEXT SUITABLE PORT - ALL COSTS OF LABOUR AND MATERIALS TO BE REIMBURSED TO OWNERS BY CHTRS AND VSL TO REMAIN ON HIRE. STEVEDORE DAMAGE AFFECTING SEAWORTHINESS AND/OR PROPER WORKING OF THE VESSEL, IN CONTRAVENTION OF CLASS REQUIREMENTS, MUST BE REPAIRED PRIOR TO VSLS DEPARTURE FROM THE PORT OF OCCURENCE. THE COST OF CLASS ATTENDANCE TO BE REIMBURSED TO OWNERS BY THE CHARTERERS. HIDDEN DAMAGE TO BE NOTIFIED TO THE CHARTERERS AS SOON AS DISCOVERED HOWEVER MAX 48 HOURES AFTER COMPLETION OF THE DISCHARGE OR LATEST BY COMPLETION OF FINAL OFF HIRE SURVEY OF THAT PARTICULAR VOYAGE, WHICHEVER IS THE EARLIER. CHARTERERS AGREE TO REIMBURSE OWNERS WITHIN 30 DAYS OF THE INVOICE DATE OF OWNERS SUBSTANTIATED CLAIMS/S,WHETHER OR NOT CHTRS HAVE RECEIVED PAYMENT FROM STEVEDORES AND/OR OTHER PARTIES. IN CASED OF ANY DISCREPANCY BETWEEN OWNERS REPRESENTATIVES, A MUTUALLY AGREED SURVEYOR WOULD BE APPOINTED TO ESTABLISH THE EXTENT OF THE DAMAGE.

**CLAUSE 42:**
PAYMENT OF CHARTER HIRE WILL BE MADE IN ACCORDANCE WITH CLAUSE 4, BUT OWNERS SHALL IMMEDIATELY INFORM CHARTERERS SHOULD HIRE DUE NOT HAVE BEEN RECEIVED ON DUE DATE. CHARTERERS SHALL THEN WITHIN 3 BANKING DAYS AFTER RECEIVING SUCH NOTICE ARRANGE TO RECTIFY THE SITUATION. SHOULD CHARTERERS FAIL TO DO SO, OWNERS HAVE THE RIGHT TO WITHDRAW THE VESSEL.

**CLAUSE 43:**
SHOULD THE VESSEL BE PUT BACK ON A VOYAGE BY REASON OF ANY ACCIDENT OR BREAKDOWN OF GEAR/VESSEL, UNLESS CAUSED BY CHARTERERS OR THEIR SERVANT THE HIRE SHALL BE SUSPENDED FROM THE TIME OF HER PUTTING BACK UNTIL SHE IS AGAIN IN THE SAME POSITION OR EQUIVALENT AND VOYAGE RESUMED THEREFROM. THE TIME SO LOST AND THE COST OF ANY EXTRA FUEL CONSUMED IN CONSEQUENCE THEREOF AND EXPENSES DIRECTLY INCURRED THEREBY SHALL BE DEDUCTED FROM HIRE.

**CLAUSE 44:**
SHOULD THE VESSEL BE ARRESTED DURING THE CURRENCY OF THE CHARTER AT THE SUIT OF ANY PERSON HAVING OR PURPORTING TO HAVE A CLAIM AGAINST OR ANY INTEREST IN THE VESSEL, HIRE UNDER THIS CHARTER SHALL NOT BE PAYABLE IN RESPECT OF ANY PERIOD WHILST THE VESSEL REMAINED UNEMPLOYED AS A RESULT OF SUCH ARREST, I.E THE STATE OF ARREST HAVING NO BEARING ON HIRE UNLESS THE VESSEL IS PREVENTED FROM WORKING THEREBY.

4

### ADDITIONAL CLAUSES TO THE CHARTER PARTY
### MV "SOUTHGATE"
### DATED 23RD NOVEMBER 2007

**CLAUSE 45:**
IN THE EVENT OF A STRIKE OF A PART OF THE SHIP'S CREW PREVENTING THE     VESSEL FROM NORMAL WORKING AND SAILING, THE HIRE SHALL BE SUSPENDED FROM SUCH TIME UNTIL RESUMPTION OF THE WORK.

**CLAUSE 46:**
OWNERS ALWAYS TO BE RESPONSIBLE FOR ANY BOYCOTT OF THE VESSEL BY I.T.F. AND/OR THEIR AFFILIATES.
SHOULD THE VESSEL BE BOYCOTTED, BLOCKADED OR BLACKLISTED IN ANY PORT OR PLACE BECAUSE OF HER OWNERSHIP, MANAGEMENT, FLAG OR CREW, OR CONDITIONS ON WHICH THE CREW ARE EMPLOYED, ALL EXPENSES DELAYS OR OTHER DIRECT OR PROVEN CONSEQUENCES, INCLUDING OFF-HIRE TO BE FOR OWNERS ACCOUNT. IN THE EVENT OF THE VESSEL BEING DENIED OR RESTRICTED IN THE USE OF PORT AND/OR DISCHARGING FACILITIES OR SHORE LABOUR AND/OR TUG OR PILOTAGE ASSISTANCE BECAUSE OF ACTIONS OF MASTER, OFFICERS OR CREW, THE VESSEL'S FLAG OR OWNERSHIP OR MANAGEMENT OR THE WAGES OR THE CONDITIONS OF EMPLOYMENT OF THEIR OFFICERS AND/OR CREW OF ANY OTHER VESSEL UNDER THE SAME OWNERSHIP OR MANAGEMENT OR BECAUSE OF THE PREVIOUS TRADING OF THE VESSEL OR ANY OTHER VESSEL AS AFORESAID, HIRE SHALL CEASE FOR THE TIME HEREBY LOST AND OWNERS SHALL BE RESPONSIBLE FOR AND SHALL PROMPTLY REIMBURSE CHARTERERS ALL EXTRA EXPENSES WHICH CHARTERERS MAY INCUR IN TRYING TO SOLVE THE SITUATION, INCLUDING PROCEEDING TO AN ALTERNATIVE BERTH OR PORT.

**CLAUSE 47:**
OWNERS TO BE RESPONSIBLE FOR ALL CONSEQUENCES OF SMUGGLING, ATTEMPTED SMUGGLING, OR SIMILAR OFFENCES BY MASTER, OFFICERS OR CREW AND ANY DETENTION OF THE VESSEL CAUSED THEREBY IN COUNT AS OFF-HIRE, UNLESS SUCH OFFENSES ARE CAUSED BY CHARTERERS' AGENTS OR SERVANTS, IN WHICH CASE CHARTERERS TO BE RESPONSIBLE FOR SUCH CONSEQUENCES AND VESSEL TO REMAIN ON HIRE FOR THE ENTIRE DURATION.

**CLAUSE 48:**
THE VESSEL TO WORK DAY AND NIGHT IF REQUIRED BY CHARTERERS.
IF THE VESSEL GEAR FOR OPENING AND CLOSING HATCHES BECOMES INOPERATIVE, THE VESSEL TO BE OFF-HIRE AND SUCH OFF-HIRE TO BE CALCULATED PRO RATA IF SHIP'S LOADING OR DISCHARGING IS DELAYED. IF THE VESSEL IS TO LIFT GRAIN CARGOES ALL INTERMEDIATE OPENING OR CLOSING OF HATCHES TO BE FOR CHARTERERS' ACCOUNT IF PERFORMED BY SHORE LABOUR BUT TO BE PERFORMED BY VESSELS CREW AT NO COST TO CHARTERERS IF PERMITTED BY LOCAL AUTHORITIES.

**CLAUSE 49:**
ANY DELAY DUE TO NON-COMPLIANCE OR ANY LACK OF PROPER DOCUMENTATION OR EQUIPMENT IS TO BE TREATED AS OFF-HIRE AND ANY EXPENSES DIRECTLY INCURRED THEREBY TO BE FOR OWNERS ACCOUNT UNLESS SUCH NON COMPLIANCE IS DUE TO THE DEFAULT OF CHARTERERS, SUB-CHARTERERS OR THEIR AGENTS.

**CLAUSE 50:**
OWNERS MAY NOT DRY DOCK THE VESSEL DURING THE CURRENCY OF THIS CHARTER FOR ANY PURPOSES. HOWEVER IF SEAWORTHINESS OF VESSEL IS AFFECTED, TIME

5

## ADDITIONAL CLAUSES TO THE CHARTER PARTY
## MV "SOUTHGATE"
## DATED 23RD NOVEMBER 2007

**CLAUSE 50: (cont.)**
AND PLACE OF DOCKING AS WELL AS ESTIMATED DURATION TO BE MUTUALLY
AGREED.
THE VESSEL TO BE PLACED OFF-HIRE FROM THE TIME THE VESSEL PUTS BACK TO A
PORT OR DEPARTS FROM OR INTERRUPTS THE VOYAGE OR IS WITHDRAWN FROM THE
SERVICE OF CHARTERERS FOR DRYDOCKING, REPAIRS OR OTHER OWNERS'PURPOSES,
UNTIL THE VESSEL IS AGAIN IN THE SAME POSITION OR AT POINT EQUIVALENT
THERETO.

**CLAUSE 51:**
CHARTERERS HAVE THE RIGHT TO DEDUCT FROM LAST SUFFICIENT HIRE PAYMENT(S)
ESTIMATED VALUE OF BUNKERS ON BOARD ON REDELIVERY TOGETHER WITH
ESTIMATED OWNERS'DISBURSMENT, IF ANY, WHICH TO BE AGREED PRIOR TO
DEDUCTION.

**CLAUSE 52:**
DELETED.

**CLAUSE 53:**
SHOULD THE VESSEL BE LOST, HIRE SHALL CEASE AT NOON ON THE DAY OF HER
LOSS, AND SHOULD THE VESSEL BE MISSING, HIRE SHALL CEASE AT NOON ON THE
DAY SHE WAS LAST HEARD OF, AND ANY HIRE PAID IN ADVANCE AND NOT EARNED,
SHALL BE RETURNED TO CHARTERERS, IF THE VESSEL IS REQUISITIONED FOR USE,
SHE SHALL BE
DEEMED OFF-HIRE DURING THE PERIOD OF REQUISITION AND ANY HIRE PAID IN
RESPECT OF SUCH REQUISITION PERIOD SHALL BE FOR OWNERS'BENEFIT.
ANY PERIOD DURING WHICH THE VESSEL IS REQUISTIONED SHALL COUNT AS PART OF
THE PERIOD PROVIDED FOR IN THIS CHARTER.CHARTERERS HAVE THE OPTION TO
CANCEL THIS CHARTER IF THE REQUISITION PERIOD EXCEEDS 3 MONTHS.

**CLAUSE 54:**
IF WAR OR ACTUAL HOSTILITIES THAT ARE DIRECTLY INFLUENCES THE TRADING OF
THE VESSEL BREAK OUT BETWEEN ANY TWO OR MORE OF THE FOLLOWING
COUNTRIES: U.K, RUSSIA, U.S.A., FRANCE, PEOPLE'S REPUBLIC OF CHINA, JAPAN,
GERMANY, NORWAY, BOTH OWNERS AND CHARTERERS SHALL HAVE THE RIGHT TO
CANCEL THIS CHARTER.PROVIDED VESSEL IS FREE OF CARGO  IT IS UNDERSTOOD
THAT WAR OR ACTUAL HOSTILITIES MEANS WAR OR HOSTILITIES DIRECTLY
BETWEEN THESE NATIONS AND DOES NOT INCLUDE LOCAL HOSTILITIES OR CIVIL
WAR WHERE ANY OF THE ABOVE COUNTRIES SUPPORTS OPPOSING SIDES.

**CLAUSE 55:**
WAR CLAUSES: CONWARTIME 2004 CLAUSES TO APPLY.

**CLAUSE 56:**
CHARTERERS SHALL GIVE OWNERS 20/15 DAYS NOTICE OF EXPECTED REDELIVERY
TIME AND PLACE AND 10/5 DAYS NOTICE OF DEFINITE REDELIVERY DATE AND PORT.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY
## MV "SOUTHGATE"
## DATED 23RD NOVEMBER 2007

**CLAUSE 57:**

CARGO CLAIMS SHALL BE SETTLED IN ACCORDANCE WITH THE INTER-CLUB NEW YORK PRODUCE EXCHANGE AGREEMENT, AS AMENDED MAY, 1984 AND ANY SUBSEQUENT AMENDMENTS THERETO.

**CLAUSE 58:**

THIS CHARTER IS SUBJECT TO THE FOLLOWING CLAUSES ALL OF WHICH ARE TO BE INCLUDED IN ALL BILL OF LADING ISSUED HEREUNDER

**NEW BOTH TO BLAME COLLISION CLAUSE:**

"IF THE SHIP COMES IN COLLISION WITH ANOTHER SHIP AS A RESULT OF THE NEGLIGENCE OF THE OTHER SHIP AND ANY ACT, NEGLECT OR DEFAULT OF THE MASTER, MARINER, PILOT OR THE SERVANTS OF THE CARRIER IN THE NAVIGATION OR IN THE MANAGEMENT OF THIS SHIP, THE OWNERS OF THE GOODS CARRIED HEREUNDER WILL INDEMNIFY THE CARRIERE AGAINST ALL LOSS OR LIABILITY TO THE OTHER OR NON-CARRYING SHIP OR HER OWNERS IN SO FAR AS SUCH LOSS OR LIABILITY REPRESENTS LOSS OF OR DAMAGE TO OR ANY CLAIM WHATSOEVER OF THE OWNERS OF THE SAID GOODS, PAID OR PAYABLE BY THE OTHER OR NON-CARRYING SHIP/OR HER OWNERS TO THE OWNERS OF THE SAID GOODS AND SET OFF, RECOUPED OR RECOVERED

BY THE OTHER OR NON-CARRYING SHIP OR HER OWNERS AS PART OF THEIR CLAIM AGAINST THE CARRYING SHIP OR CARRIERS.

THE FOREGOING PROVISIONS SHALL ALSO APPLY WHERE THE OWNERS, OPERATORS OR THOSE IN CHARGE OF ANY SHIP OR SHIPS OR OBJECTS OTHER THAN, OR IN ADDITION TO, THE COLLIDING SHIPS OR OBJECTS ARE AT FAULT IN RESPECT OF A COLLISION OR CONTRACT."

**NEW JASON CLAUSE:**

"IN THE EVENT OF ACCIDENT, DANGER, DAMAGE OR DISASTER BEFORE OR AFTER THE COMMENCEMENT OF THE VOYAGE, RESULTING FROM ANY CAUSE WHATSOEVER WHETHER DUE TO NEGLIGENCE OR NOT, FOR WHICH, OR FOR THE CONSEQUENCES OF WHICH, THE CARRIER IS NOT RESPONSIBLE BY STATUTE, CONTRACT OR OTHERWISE, THE GOODS, SHIPPERS, CONSIGNEES OR OWNERS OF THE GOODS SHALL CONTRIBUTE WITH THE CARRIER IN GENERAL AVERAGE TO THE PAYMENT OF ANY SACRIFICES, LOSSES OR EXPENSES OF A GENERAL AVERAGE NATURE THAT MAY BE MADE OR INCURRED AND SHALL PAY SALVAGE AND SPECIAL CHARGES INCURRED IN RESPECT OF THE GOODS. IF A SALVING SHIP IS OWNED OR OPERATED BY THE CARRIER, SALVAGE SHALL BE PAID FOR AS FULLY AS IF THE SAID SALVING SHIP OR SHIPS BELONGED TO STRANGERS.SUCH DEPOSIT AS THE CARRIER OR HIS AGENTS MAY DEEM SUFFICIENT TO COVER THE ESTIMATED CONTRIBUTION OF THE GOODS AND ANY SALVAGE AND SPECIAL CHARGES THEREON SHALL, IF REQUIRED, BE MADE BY THE GOODS, SHIPPERS, CONSIGNEE OR OWNERS OF THE GOODS TO THE CARRIER BEFORE DELIVERY."

**CLAUSE 59:**

THE FOLLOWING CLAUSES ARE TO BE INCLUDED IN ALL BILL OF LADING ISSUED HEREUNDER:

<u>ADDITIONAL CLAUSES TO THE CHARTER PARTY</u>
<u>MV "SOUTHGATE"</u>
<u>DATED 23RD NOVEMBER 2007</u>

### CLAUSE 59(cont.)
### GENERAL PARAMOUNT CLAUSE:
"THIS BILL OF LADING SHALL HAVE EFFECT SUBJECT TO THE PROVISIONS OF ANY LEGISLATION RELATING TO THE CARRIAGE OF GOODS BY SEA WHICH INCORPORATES THE RULES RELATING TO BILLS OF LADING CONTAINED IN THE INTERNATIONAL CONVENTION, DATED BRUSSELES 25th AUGUST 1924 AND WHICH IS COMPULSORY APPLICABLE TO THE CONTRACT OF CARRIAGE HEREIN CONTAINED.
SUCH LEGISLATION SHALL BE DEEMED TO BE INCORPORATED HEREIN, BUT NOTHING HEREIN CONTAINED SHALL BE DEEEMED A SURRENDER BY THE CARRIER OF ANY OF ITS RIGHTS OR IMMUNITIES OR ANY INCREASE OF ANY OF ITS RESPONSIBILITIES OR LIABILITIES THEREUNDER.IF ANY TERM OF THIS BILL OF LADING BE REPUGNANT TO ANY EXTENT TO ANY LEGISLATION BY THIS CLAUSE INCORPORATED, SUCH TERMS SHALL BE VOID TO THAT EXTENT BUT NO FURTHER.

### P&I BUNKERING CLAUSE:
THE VESSEL SHALL HAVE THE LIBERTY AS PART OF THE CONTRACT VOYAGE AND AT ANY STAGE THEREOF TO PROCEED TO ANY PORT OR PORTS WHATSOEVER SUCH PORTS ARE ON OR OFF THE DIRECT AND/OR CUSTOMARY ROUTE OR ROUTES TO THE PORT OF LOADING OR DISCHARGING NAMED IN THIS CHARTER PARTY AND THERE TAKE OIL BUNKERS IN ANY QUANTITY IN THE DISCRETION OF OWNERS EVEN TO THE FULL CAPACITY OF FUEL TANKS, DEEPTANKS AND ANY OTHER COMPARTMENTS IN WHICH OIL CAN BE CARRIED WHETHER SUCH AMOUNT IS OR IS NOT REQUIRED FOR THE CHARTERED VOYAGE.

### CLAUSE 60:
OWNERS WARRANT THAT THROUGHOUT THE CURRENCY OF THIS CHARTER THEY WILL PROVIDE THE VESSEL WITH THE FOLLOWING VALID CERTIFICATES:

(A) CERTIFICATES ISSUED PURSUANT TO THE CIVIL LIABILITY CONVENTION 1969("CLC")

(B) CERTIFICATES ISSUED PURSUANT TO SECTION 311(P) OF THE U.S. FEDERAL WATER POLLUTION CONTROL ACT,AS AMENDED (TITLE 33 U.S. CODE,SECTION 1321(P))

(C) CERTIFICATES WHICH MAY BE REQUIRED BY U.S. FEDERAL LEGISLATION AT ANY TIME DURING THE CURRENCY OF THIS CHARTER PROVIDED ALWAYS THAT SUCH LEGISLATION INCORPORATED THE ("CLC") AS AMENDED BY THE 1984 PROTOCOL THERETO OR CONTAINS PROVISIONS EQUIVALENT THERETO.

### CLAUSE 61:
OWNERS WARRANT THAT OWNERS/DISPONENT OWNERS HAS GUIDELINES ON DRUG OR ALCOHOL ABUSE APPLICABLE TO THE VESSEL WITH THE OBJECT THAT NO SEAFARER WILL NAVIGATE A SHIP OR OPERATE IT'S ONBOARD EQUIPMENT WHILE IMPAIRED BY DRUGS OR ALCOHOL AND THAT NO SEAFARER WILL HAVE THE USE OR POSSESION OF, OR THE OPPORTUNITY TO SELL OR DISTRIBUTE OR TRANSPORT ILLICIT OR NON-PRESCRIBED DRUGS ABOARD THE VESSEL.FURTHER, CHARTERERS EXPECT THAT OWNERS/DISPONENT OWNERS EXERCISE DUE DILIGENCE THROUGHOUT THE PERIOD OF CHARTER PARTY TO ENSURE THAT SUCH GUIDELINES ARE COMPILED WITH.

8

**ADDITIONAL CLAUSES TO THE CHARTER PARTY**
**MV "SOUTHGATE"**
**DATED 23RD NOVEMBER 2007**

**CLAUSE 62:**
VESSEL'S DESCRIPTION:

```
SOUTHGATE
LIBERIAN 1982
BULKCARRIER,
25,417MT DWAT ON 10.229M SSW  TPC 34.1
LOA 160.8M  BEAM 25.2M
4HO/HA 1)18.4 X 12.8  2)3)4)21.6 X 12.8
DERR 1 X 25T  CRANE  3 X 25T
SPD CONS ABT 13 KN ON ABT 24MT IFO 180 CST + 2 MDO
UNDER GOOD WEATHER CONDITIONS OF UPTO/INCL BFF4 AND DSS 3
PORT CONS 2MT MDO IDLE/2.5 MT MDO WORKING
INT GT/NT 15274/9049
CONSTANTS 350MT EXCL FW
TPC 34.18 ON FULL MARKS

BUNKER CAP   IFO 1200
             MDO 130

LOAD UPPER DECK 3.3MT/M2
     HA COVER   2.4MT/M2
     TT         11.4MT/M2
FGO WOG
```

| HO DIM | LENGTH | BREADTH | |
|--------|--------|---------|-------|
| | | FORE | AFT |
| 1 | 27.6 | 7.2 | 20.80 |
| 2 | 27.6 | 20.80 | |
| 3 | 27.9 | 20.80 | |
| 4 | 29.4 | 20.80 | 10.40 |

| GRAIN B/DOWN | | BALE B/DOWN | |
|--------------|---------|-------------|---------|
| 1/ | 250234 | 1/ | 236774 |
| 2/ | 302502 | 2/ | 286102 |
| 3/ | 302104 | 3/ | 286270 |
| 4/ | 301032 | 4/ | 288684 |
| TTL | 1155872 CUFT | | 1097830 CUFT |

```
MAX OUTREACH CRANES: 9.4M
             DERR  : 3.5M
OWNERS ARE 'ASSOCIATED BULK CARRIERS LIMITED,LONDON'

DIST FROM SHIPS RAIL TO INSIDE HATCH COAMING 6.25M

DIST FROM WATER LINE TO TOP HATCH COAMING FULLY BALLASTED
H1  11.45M
H2  11.13M
H3  10.79M
H4  10.46M

ALL DETAILS ABOUT
```

9

**ADDITIONAL CLAUSES TO THE CHARTER PARTY**
**MV "SOUTHGATE"**
**DATED 23RD NOVEMBER 2007**

**CLAUSE 63:**
**LAW AND ARBITRATION**
THIS C/P SHALL BE GOVERNED BY ENGLISH LAW AND ANY DISPUTE
ARISING OUT OF OR IN CONNECTION WITH THIS CHARTER SHALL BE
SUBMITTED TO THE EXCLUSIVE JURISDICTION OF THE HIGH COURT OF
JUSTICE IN ENGLAND AND WALES.
OWNERS AND CHTRS IRREVOCABLY APPOINT THEIR RESPECTIVE BROKERS TO
ACCEPT SERVICE IN RESPECT OF ANY AND ALL PROCEEDINGS COMMENCED IN
THE HIGH COURT OF JUSTICE. CHTRS BROKERS ARE ... (FULL ADDRESS).
(CHARTS BEHALF WD BE: MFB SOLICITORS, PIC MARK SEWARD.)

SMALL CLAIMS CLAUSE.
NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS CHARTERPARTY,
THE PARTIES AGREE THAT ALL ARBITRATIONS WHERE THE AMOUNT IN ISSUE
IN THE DISPUTE(S) IS LESS THAN U.S.DOLLARS 100,000 SHALL BE
CONDUCTED ACCORDING TO THE SMALL CLAIMS PROCEDURE 1994 (S.C.P.)
OF THE LONDON MARITIME ARBITRATORS ASSOCIATION (AS AMENDED FROM
TIME TO TIME).
GENERAL AVERAGE LONDON.

**CLAUSE 64:**
DELETED.

**CLAUSE 65:**
DELETED.

**CLAUSE 66:**
OWNERS' BANK FOR REMITTANCE OF HIRE/BUNKERS PAYMENTS;
HIRE/BUNKERS PAYMENT TO BE MADE IN U.S. CURRENCY BY TELEGRAPHIC
TRANSFER TO:

NORDEA BANK, LONDON,
8TH FLOOR, CITY PLACE HOUSE,
55 BASINGHALL STR,
LONDON EC2V 5NB.

SWIFT:   NDEAGB2L.

IN FAVOUR OF: ASSOCIATED BULK CARRIERS LTD,

A/C NO:   54353102.

VIA CORRESPONDENT BANK:

CHASE, NEW YORK,
SWIFT: CHASUS33,

10

## ADDITIONAL CLAUSES TO THE CHARTER PARTY
## MV "SOUTHGATE"
## DATED 23RD NOVEMBER 2007

### CLAUSE 67:
BUNKER CLAUSE
THE VESSEL SHALL DELIVER WITH ABOUT 600/650 METRIC TONS
INTERMEDIATE FUEL OIL AND ABOUT 50/60 METRIC TONS MARINE
DIESEL OIL AND CHARTERERS SHALL REDELIVER THE VESSEL WITH
ABOUT THE SAME QUANTITIES AS ON DELIVERY. CHARTERERS ON DELIVERY
AND OWNERS ON REDELIVERY SHALL TAKE OVER AND PAY FOR ALL FUEL
REMAINING ON BOARD THE VESSEL AT  U.S. DOLLARS 500 PER METRIC
TON I.F.O. AND U.S. DOLLARS 800  PER METRIC TON M.D.O. BUNKERS
ON DELIVERY TO PAID WITH FIRST HIRE. ANY BUNKERS TO BE DELIVERED
TO THE VESSEL UNDER THIS CHARTER TO COMPLY WITH ISO
SPECIFICATIONS AND SHALL MEET THE MARPOL ANNEX 6 REQUIREMENTS.
LOW SULPHUR FUEL OIL WILL NOT BE SUPPLIED TO THE VESSEL WITHOUT
OWNERS PRIOR APPROVAL. MDO SHALL BE FREE FROM USED LUBRICATING
OIL.OWNERS TO HAVE THE PRIVILEGE OF BUNKERING FOR THEIR OWN
ACCOUNT PRIOR TO REDELIVERY PROVIDED SAME DOES NOT INTERFER WITH
DISCHARGING OPERATIONS.

### CLAUSE 68:
VESSEL TO BE EMPLOYED IN LAWFUL TRADES FOR 2/3 LADEN LEGS UP TO MAXIMUM
125 DAYS ALWAYS WITHIN INTERNATIONAL NAVIGATING LIMITS ALWAYS AFLOAT,
ALWAYS VIA SAFE PORT(S), SAFE BERTH(S).

ALL WAR AND WAR LIKE ZONE, WHERE EXTRA WAR RISK PREMIUM TO APPLY AND
CHARGED BY VESSEL'S HULL UNDERWRITERS.
IF ANY ADDITIONAL PREMIUM, SAME TO BE FOR CHARTERERS' ACCOUNT.
VESSEL IS NOT TO TRADE TO ABKHAZIA, ALBANIA, ANGOLA (including
Cabinda), AUSTRALIA, CAMBODIA, C.I.S. PACIFIC PORTS, CUBA,
DENMARK, ERITREA, FINLAND, HAITI, ICELAND, IRAQ, ISRAEL,LEBANON,
LIBERIA, LYBIA, NEW ZEALAND, NICARAGUA, NORTH KOREA, NORWAY,
SIERRA LEONE, SOMALIA, SRI LANKA, SWEDEN, SYRIA, YEMEN, ZAIRE,
ANY COUNTRY NOT COMPLYING WITH THE ISPS CODE,ANY WAR ZONES OR
ANY COUNTRY UNDER U.N. SANCTIONS.
CONWARTIME 2004 TO APPLY.  VESSEL NOT TO TRADE ICE.

VESSEL WILL ONLY TRADE TUNISIA PROVIDED CHTRS REMAIN RESPONSIBLE
FOR ALL CARGO/SHORTAGE CLAIMS.IF IN CONNECTION WITH ANY SUCH
CLAIM, THE VESSEL  SHOULD BE ARRESTED/DETAINED , THE CHARTERERS
TO PROVIDE ON DEMAND SUCH BAIL OR SECURITY AS MAYBE REQUIRED
IN ORDER TO PREVENT SUCH ARREST/DETENTION.

WHEN TRADING VIA RIVER PARANA (ARGENTINA), VSL WILL NAVIGATE
VIA MITRE CHANNEL ONLY

IF THE WAR/WAR LIKE ZONE HAVE BEEN DECLARED BY VESSEL'S UNDERWRITERS
AND/OR P&I CLUB AFTER CARGO HAS ALREADY BEEN LOADED ON BOARD,
SUBSEQUENTLY, THE WAR RISK CLAUSE OF OWNERS P&I CLUB TO APPLY ·AND
CHARTERERS ARE FULLY RESPONSIBLE TO PAY FOR ALL ADDITIONAL WAR RISK
PREMIUM UPON DEMAND OF VESSEL'S UNDERWRITERS AND/OR P&I CLUB WITH ALL
RISKS/CONSEQUENCES TO BE FOR CHARTERERS' ACCOUNT INSUCH CASE

11

## ADDITIONAL CLAUSES TO THE CHARTER PARTY
## MV "SOUTHGATE"
## DATED 23RD NOVEMBER 2007

### CLAUSE 68: (cont.)
OWNERS/MASTER HAVE THE OPTION OF LEAVING THE PORT IMMEDIATELY WITHOUT CONSENT.
CHARTERERS AND OWNERS/MASTER SHALL NOT BE HELD RESPONSIBLE FOR ANY/ALL CONSEQUENCES/LOSSES/EXPENSES RESULTED FROM THE ACTIONS TAKEN BY THE OWNERS/MASTER.
THE "CONWARTIME 2004 WAR RISK CLAUSE"IS DEEMED TO BE INCORPORATED IN THIS CHARTER PARTY AND ALL BILL(S) OF LADING ISSUED HEREUNDER.

### CLAUSE 69:
### CARGO EXCLUSIONS:
ALL CARGOES CARRIED UNDER THIS CHARTER TO BE LOADED/STOWED
CARRIED AND DISCHARGED IN ACCORDANCE WITH RECOMMENDATIONS
OF IMO CODE OF SAFE PRACTICE.
CARGO EXCLUSIONS
THE FOLLOWING CARGOES ARE EXCLUDED UNDER THIS CHARTER PARTY : -

ACIDS/AMMONIUM NITRATE/AMMONIUM SULPHATE/ASBESTOS/ASPHALT IN
BULK/BITUMEN/BONES/BONEMEAL/BORAX/BULK FLOUR/CALCIUM
CARBIDE/CALCIUM CHLORIDE/CALCIUM HYPOCHLORITE/CEMENT IN BULK OR
BAGS/CEMENT CLINKER/CHARCOAL/CHILEAN
NITRATE/CLAY/COBBLESTONES/COLD AND HOT BRIQUETTED
IRON/CONTAINERS/COPPER CARBIDE/COPRA/COTTON/CREOSOTE/CREOSOTED
GOODS/DIRECT REDUCED IRON/ESPARTO GRASS/EXPELLERS INCLUDING
OILSEED CAKE/FERRO
SILICON/FISH/FISHMEAL/GRANITE/HIDES/JUTE/LIVESTOCK/LIMESTONE/
LOGS/MANIOC/MINERAL SAND/MOBILE HOMES/MOTOR
SPIRIT/NAPTHA/NITRATE OF SODA/NICKEL ORE/PALM
KERNELS/PEROXIDE/PETROLEUM OR ITS PRODUCTS
PITCH/POND COAL AND BROWN COAL/POTASSIUM
NITRATE/PYRITES/QUICKLIME
RESIN/RICE BULK AND BAGGED/SALT/SALTPETRE/SCRAP INCLUDING
MOTOR BLOCKS AND TURNINGS/SILICA SAND/SILICA MANGANESE/SODA ASH
/SODIUM SULPHATE/SPENT OXIDE/SULPHUR/
TAPIOCA/TAR/TOBACCO/TURPENTINE/VEHICLES/ZINC ASH
AMMUNITION/ARMS/BLASTING
CAPS/DETONATORS/EXPLOSIVES/ISOTOPES/NUCLEAR
MATERIALS/NUCLEAR AND TOXIC CHEMICALS AND WASTE/RADIOACTIVE
PRODUCTS AND WASTE/ALL DANGEROUS INJURIOUS HAZARDOUS AND
INFLAMMABLE CARGOES

Iron ore and/or iron ore pellets and/or concentrates in bulk to
be loaded, stowed, carried and discharged according to imo
recommendations and local regulations.

If charterers require option to load steel, then Owners and
Charterers to split the cost of a precondition survey .
Steel Coils to be loaded to masters satisfaction with regard to

12

**ADDITIONAL CLAUSES TO THE CHARTER PARTY**
**MV "SOUTHGATE"**
**DATED 23RD NOVEMBER 2007**

### CLAUSE 69: (cont.)

Stress trim and stability requirements and always in accordance
with IMO and in compliance with loacal load/disch port
authorities regulations.

Vessel is not to be employed in carriage of steel slabs which
employ California block stowage or vertical block stowage

Concentrates always to be laoded in accordance with IMO and local
regulations/recommendations. Moisture test of cargo to be taken
by competent authority just prior to loading and a
certificate,stating moisture content is within imo regulations,to
be handed to master prior loading commences.

### CLAUSE 70:

ALL CARGO TO BE DELIVERED AGAINST ORIGINAL B/LS. IN CASE ORIGINAL
B/LS ARE NOT AVAILABLE THEN CHRTRS TO ISSUE AN LOI IN OWNERS
P AND I CLUB WORDING AND SAME TO BE COUNTER-SIGNED BY CARGO
RECEIVERS (SAME PARTY AS STATE IN B/LS AS CONSIGNEES) OR HEAD CHTRS
OR SHIPPERS SUBJECT TO OWNERS PRIOR APPROVAL WHICH WILL NOT
BE UNREASONABLY WITHELD

NO LINER TERMS /NO THROUGH BILLS OF LADING TO BE ISSUED CARGO TO BE
DISCHARGED AGAINST ORIGINAL BILLS OF LADING.

### CLAUSE 71:

CHARTERERS HAVE THE RIGHT TO SUPPLY OCEAN ROUTES OR SIMILAR ADVICE TO
THE MASTER DURING VOYAGE(S) SPECIFIED BY CHARTERERS. THE MASTER TO
COMPLY WITH THE REPORTING PROCEDURES OF THE ROUTING SERVICE.
WITHIN THE CONTENT OF THIS CHARTER PARTY, GOOD WEATHER CONDITIONS ARE
UNDERSTOOD TO MEAN MAXIMUM BEAUFORT FORCE 4.
WEATHER REPORTS TO BE TAKEN FROM THE VESSEL'S DECK LOG AND FROM OCEAN
ROUTES REPORT. IN THE EVENT OF VSL FAILING TO ACHIEVE THE SPEED WITHIN THE
REQUIREMNTS OF THIS C/P, THROUGHOUT THE DURATION OF THE VOYAGE,
CHRTS MAY SUBMIT A CLAIM TO THE OWS BASED ON THE FINDINGS OF THE
WEATHER ROUTING BUREAU, HOWEVER IF THERE IS A DISCREPANCY BETWEEN
WEATHER ROUTING BUREAU AND VSLS LOG BOOK, BOTH ARE TO BE TAKEN INTO
ACCOUNT FOR POST VOYAGE ANALYSIS CALCULATION. SHOULD THE VESSEL'S
AVERAGE SPEED BE LESS THAN THE SPEED STATED IN CL 62 IN NORMAL WEATHER
CONDITIONS CALCULATED FOR THE COMPLETE VOYAGE AND SHOULD THE AVERAGE
CONSUMPTION BE OVER THE CONSUMPTION STATED IN CL 62, CHARTERERS ARE AT
THE LIBERTY TO CALCULATE THE LONGER TIME SPENT DURING NAVIGATION AS WELL
AS BUNKER CONSUMED IN EXCESS, FOR THE PURPOSE OF DEBITING OWNERS WITH
SAME. ANY CLAIMS BY CHARTERERS RELATING TO THE PERFORMANCE OF THE VESSEL
AND/OR THE VESSEL'S EQUIPMENT INCLUDING SPEED CLAIMS ARE TO BE SUBMITTED
TO OWNERS IN THE FORM OF A STATEMENT OF CLAIM WITH SUPPORTING DOCUMENTS
WITHIN 60 DAYS OF THE COMPLETION OF THE VOYAGE CONCERNED OR OTHERVISE BE
WAIVED 'NULLIFIED'.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY
## MV "SOUTHGATE"
## DATED 23RD NOVEMBER 2007

**CLAUSE 72:**
CHARTERERS ARE TO ENSURE THAT ANY DUNNAGE/PALLETS/BRACINGS OR ANY TYPE OF SOLID WOOD PACKING MATERIAL IS CERTIFICATED AND COMPLIES WITH USDA REQUIREMENTS.

**CLAUSE 73:**
**BIMCO ISM CLAUSE**
FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL SAFETY MANAGEMENT (ISM) CODE IN RELATION TO THE VESSEL AND THEREAFTER DURING THE CURRENCY OF THIS CHARTER PARTY, THE OWNER SHALL PROCURE THAT BOTH THE VESSEL AND "THE COMPANY" (AS DEFINED BY THE ISM CODE) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISM CODE. UPON REQUEST THE OWNER SHALL PROVIDE A COPY OF THE RELEVANT DOCUMENT OF COMPLIANCE (DOC) AND SAFETY MANAGEMENT CERTIFICATE (SMC) TO THE CHARTERERS.
EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE OR DELAY CAUSED BY FAILURE ON THE PART OF THE OWNERS OR "THE COMPANY" TO COMPLY WITH THE ISM CODE SHALL BE FOR THE OWNERS ACCOUNT.

**CLAUSE 74:**
NEGOTIATIONS AND FIXTURE TO REMAIN PRIVATE AND CONFIDENTIAL BY ALL PARTIES INVOVLED.

**CLAUSE 75:**
THE VESSEL TO HAVE THE LIBERTY OF USING DIESEL OIL WHEN ENTERING AND LEAVING PORT AND FOR MANOEUVRING IN SHALLOW, NARROW WATERS.

**CLAUSE 76:**
ALL TAXES AND/OR DUES ON THE VESSEL AND/OR CARGO AND/OR CHARTER HIRE AND/OR FREIGHT (EXCEPT INCOME TAX AND/OR TAX ON TIMECHARTER HIRE LEVIED IN THE COUNTRY OF THE VESSEL AND/OR HER OWNERS DOMICILE ) ARISING OUT OF THE CARGOES CARRIED OR THE PORTS VISITED UNDER THIS CHARTER PARTY SHALL BE FOR CHARTERERS ACCOUNT. ALL DUES, DUTIES, CHARGES AND/OR TAXES ON CREW AND OR STORES TO BE FOR OWNERS ACCOUNT.

**CLAUSE 77:**
CHARTERERS'AGENTS TO ATTEND TO VESSEL NORMAL REQUIREMENTS WITHOUT CHARGING AN AGENCY FEE. FOR EXTRA ATTENDANCE SUCH AS MAJOR REPAIRS ETCETERA AGENCY FEE TO BE NEGOTIATED BETWEEN OWNERS AND AGENT.

**CLAUSE 78:**
CRANEMEN TO BE SUPPLIED AND PAID FOR BY CHARTERERS.

**CLAUSE 79:**
VESSEL TO PROVIDE, AT NO COST TO CHARTERERS, ELECTRICAL POWER, AS ON BOARD, FOR RECEIVERS GRABS AND SHORE BAGGING MACHINES BUT THE OPERATIONS IS TO BE ENTIRELY AT CHARTERERS, RISK AND EXPENSE.
ALL EQUIPMENT AND LABOUR FOR SUCH ARRANGEMENT TO BE PROVIDED BY RECEIVERS.

<u>ADDITIONAL CLAUSES TO THE CHARTER PARTY</u>
<u>MV "SOUTHGATE"</u>
<u>DATED 23RD NOVEMBER 2007</u>

**<u>CLAUSE 80:</u>**
DELETED.

**<u>CLAUSE 81:</u>**
   BIMCO CONWAR 2004
   BIMCO ISPS/MTSA CLAUSE
   BIMCO ISM CLAUSE
   BIMCO US CUSTOMS ADVANCE NOTIFICATION/MTSA CLAUSE
ARE INCORPORATED IN THIS CHARTER PARTY.


++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

15

Ex. 3

GEORGE B. FREEHILL
WILLIAM L. JUSKA, JR.
JAMES L. ROSS*
ERIC E. LENCK
JOHN J. WALSH*
PATRICK J. BONNER*
PETER J. GUTOWSKI
MARK F. MULLER
WAYNE D. MEEHAN*
DON P. MURNANE, JR.△
THOMAS M. RUSSO
THOMAS M. CANEVARI†
MICHAEL FERNANDEZ*
JOHN F. KARPOUSIS*△
MICHAEL E. UNGER*†
WILLIAM J. PALLAS*
GINA M. VENEZIA*△
LAWRENCE J. KAHN*
BARBARA G. CARNEVALE*
MANUEL A. MOLINA
JUSTIN T. NASTRO*
PAMELA L. SCHULTZ*°†
DANIEL J. FITZGERALD*†△
MICHAEL C. ELLIOTT*
JAN P. GISHOLT†

* ALSO ADMITTED IN NEW JERSEY
† ALSO ADMITTED IN CONNECTICUT
△ ALSO ADMITTED IN WASHINGTON, D.C.
° ALSO ADMITTED IN LOUISIANA

**LAW OFFICES OF**
# FREEHILL HOGAN & MAHAR LLP
**80 PINE STREET**
**NEW YORK, N.Y. 10005-1759**

TELEPHONE (212) 425-1900

FACSIMILE (212) 425-1901

E-MAIL: reception@freehill.com

www.freehill.com

NEW JERSEY OFFICE
549 SUMMIT AVENUE
JERSEY CITY, N.J. 07306-2701
TELEPHONE (973) 623-5514
FACSIMILE (973) 623-3813

CONNECTICUT OFFICE
23 OLD KINGS HIGHWAY SOUTH
DARIEN, CT 06820-4538
TELEPHONE: (203) 921-1913
FACSIMILE (203) 358-8377

February 14, 2008

OUR REF: 70-08/PJG/PLS

## TENDER OF SECURITY AND APPLICATION FOR
## LEAVE TO FILE MOTION FOR COUNTER-SECURITY

*Via Email*
Thomas L. Tisdale, Esq.
Lauren C. Davies, Esq.
Tisdale Law Offices, LLC
11 West 42nd Street, Suite 900
New York, NY 10036
Email: ttisdale@tisdale-law.com
        ldavies@tisdale-law.com

        Re:    Industrial Carriers Inc. v.
                    Associated Bulk Carriers Ltd.
                    08-Civ. 0575 (VM)
                    Rule B Attachment at New York
                    -------------------------------------------

Dear Tom and Lauren,

       I write to advise that we have been retained on behalf of the Defendant Associated Bulk Carriers Ltd. and have filed an appearance on their behalf which should now be up on the ECF system. In this respect, I note that you applied for and were granted an Order of Attachment in the total sum of $16,353.14, the suit being in the nature of a security proceeding and it is on that point that I write.

NYDOCS1/299068.1

February 14, 2008
Page 2

    With this letter, we are tendering to the plaintiff full cash security in the total amount
specified in the PMAG to be maintained in the form of a cash escrow account which I confirm
we are presently holding in our firm's trust account. If the plaintiff would prefer that those funds
be deposited with the registry of the Court, we would be happy to do so and will attend to that
immediately, but given the amounts at stake and in lieu of incurring that additional cost of
placing the funds with the Clerk, we would propose that we simply agree between ourselves that
the funds presently in our trust account will be held in escrow and not be released other than in
accordance with a further court order regarding that security or some agreement of the parties.

    In either event, it is our position that pursuant to Supplemental Rule E, the defendant has
now posted full security and under these circumstances, any service of the process of attachment
or restraint of other funds would be improper. I would be grateful if you would confirm to me
that no service will henceforth be made.

    Also, can you confirm for me whether service has been effected on any garnishee(s), and
if so, please identify the entities on whom service has been made. Please further advise whether
any funds have been restrained. If no other funds have been restrained, would you please
immediately attend to the issuance of a cease & desist notice to any and all garnishee(s) served.

    Moving forward, and to the extent security has been posted, we now call upon Industrial
Carriers, the plaintiff, to post counter-security in respect to the claims that our client has back
over against the plaintiff arising from the same charter party. In this respect, and as plaintiff is
already aware, our client has a claim for $302,749.45, plus interest and costs. Utilizing the same
formula outlined in your application with respect to interest (3 years at 6%), an additional sum of
$54,494.90 should be added to that amount to cover interest. Also, and as outlined in your
Complaint, since attorney fees and arbitral costs are awarded to the prevailing party, yet an
additional sum should be added to the counter-security to cover that potential award. We
estimate those anticipated costs to be $65,000, so the total sum to be posted as security for our
counter-claim is $422,244.35.

    Can you please liaise with your client and arrange for the posting of a reciprocal cash
deposit in your trust account for the total sum of the counterclaim, thus obviating the need for us
to make an application with the Court.

    By copy of this letter to the Court, we take this opportunity to confirm the foregoing, in
particular, that: (i) the defendant has appeared; (ii) tendered full security for the amount
designated in the Process of Attachment, and (iii) made a demand for counter-security. We also
note that in the event counter-security is not promptly arranged, a motion will be made for that
relief. We would propose that if suitable and acceptable counter-security is provided within one
week, that we be authorized to proceed with a motion for counter-security, *and that this letter be
treated as our application for permission to do so under the Court's Individual Rules.* We
hasten to add that with respect to this potential application, the fact that the claim for the counter-

FREEHILL, HOGAN & MAHAR LLP

February 14, 2008
Page 3

security is greater than the original claim for security is of no moment. *See, Voyager Shipholding Corp. v. Hanjin Shipping Co. Ltd.,* 07 Civ. 11123 (GEL), Opinion and Order dated February 13, 2008 at 6-8 (copy attached).

> Very truly yours,
> FREEHILL HOGAN & MAHAR LLP
>
> Peter J. Gutowski

PJG:mjg
Encl.

cc:     **By Hand**
        Hon. Victor Marrero
        United States District Judge
        Daniel Patrick Moynihan
        United States Courthouse
        500 Pearl St., Room 660
        New York, NY 10007

NYDOCS1/299068.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

VOYAGER SHIPHOLDING CORP.,                          :

               Plaintiff,                              :

    -against-                                              :

HANJIN SHIPPING CO., LTD.,                           :

              Defendant.                           :

                                 :

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/13/08

07 Civ. 11123 (GEL)

**OPINION and ORDER**

GERARD E. LYNCH, District Judge:

    In this maritime action, plaintiff Voyager Shipholding Corporation ("Voyager") obtained an order of attachment pursuant to Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, Fed. R. Civ. P. Defendant Hanjin Shipping Company, Ltd., ("Hanjin") has asserted counterclaims, and now seeks an order compelling Voyager, which has attached assets of Hanjin's totaling $242,075.85, to post countersecurity in the amount of $388,157.80.

    Hanjin chartered a ship from Voyager pursuant to a charter party dated May 7, 2004. Hanjin returned the vessel two weeks early, and paid Voyager a penalty for the idleness of the vessel for several days, as well as the difference between the hire due under Hanjin's charter party and the rate under the replacement charter that Voyager was able to obtain for the remainder of the contract period.

    Subsequently, Hanjin, the defendant in this action, initiated an arbitration in London on speed and over-consumption claims arising from certain voyages made by the ship. In connection with those claims, in June 2007 Hanjin arrested the vessel in South Africa, releasing

it upon posting of security on June 13, 2007, in the form of a letter of undertaking in the amount
of $389,546.23. In the South African action, Hanjin asserted that its claims had been based on
"a complete reconciliation the financial relationship of the parties" resulting from the charter
party.

On December 10, 2007, Voyager filed this action, alleging breach of the charter party by
Hanjin. Voyager obtained a Rule B attachment order and succeeded in obtaining security in the
amount of $242,075.85. Hanjin then asserted counterclaims. Although Hanjin has fully secured
those claims already asserted in the London arbitration through the arrest proceedings in South
Africa, the counterclaims here include three new matters which Hanjin "reserves the right to
pursue" in the London arbitration: speed and over-consumption charges relating to two voyages
not at issue in the London and South Africa proceedings, and a claim for a refund of part of the
payment it had made for early redelivery, based on the allegation that Voyager had falsely
represented that the vessel had been unemployed for the full early redelivery period. (Answer &
Counterclaim, Dec. 17, 2007, ¶ 36.) Hanjin now moves for an order requiring Voyager to post
countersecurity for the amount of these counterclaims.

Under Admiralty Rule E(7)(a), when a party who has given security for claims made in a
maritime action asserts a counterclaim "that arises from the transaction or occurrence that is the
subject of the original action," the plaintiff "must give security for damages demanded in the
counterclaim unless the court for cause shown[] directs otherwise." Although the Rule is
mandatory in form, the "unless" clause gives the court "broad discretion in deciding whether to
order countersecurity." Result Shipping Co., Ltd. v. Ferruzzi Trading USA, Inc., 56 F.3d 394,
399 (2d Cir. 1995) (citations omitted). In deciding whether cause has been shown to justify a

2

denial of countersecurity, a court should be guided by the broad purposes of the rule, which is intended "to place the parties on an equality as regards security," but not "to impose burdensome costs on a plaintiff that might prevent it from bringing suit." Id. at 399-400. Voyager raises two distinct broad objections to the posting of countersecurity on one or more of Hanjin's counterclaims.

First, Voyager argues that the claim that it misrepresented the status of the ship upon redelivery is not a counterclaim that "arises from the transaction or occurrence that is the subject of the original action," and thus falls outside of Rule E(7)(a) entirely. Voyager maintains that, because Hanjin's claim is essentially a claim for deceit that arose after the conclusion of the charter party, the claim does not arise from the same transaction – the contract of hire – as do its claims for breach of the charter party. This argument takes too narrow a view of the Rule. Because the relevant language of Rule E is identical to the definition of mandatory counterclaims in Rule 13(a)(1)(A), Fed. R. Civ. P., in determining whether a Rule E(7)(a) counterclaim arises from the same "transaction or occurrence" as the original claims, courts apply the test for compulsory counterclaims developed under Rule 13 and its predecessors. Incas & Monterey Printing & Packaging, Ltd. v. M/V Sang Jin, 747 F.2d 958, 964-65 (5th Cir. 1984); Sea-Terminals, Inc. v. Independent Container Lines, Ltd., No. 89 Civ. 6931, 1990 WL 130766, at *2 (S.D.N.Y. Sept. 4, 1990). With respect to mandatory counterclaims, it has been well established since at least 1926 that the word "transaction" has a "flexible meaning" that "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." Moore v. New York Cotton Exch., 270 U.S. 593, 610 (1926). Pursuant to this jurisprudence, the Second Circuit has taken a "broad view" of

the rule, based on whether there is a "logical relationship between the claim and the counterclaim" such that "'considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" United States v. Aquavella, 615 F.2d 12, 22 (2d Cir. 1980), quoting Harris v. Steinem, 571 F.2d 119, 123 (2d Cir. 1978). Other courts have applied the same test in the context of Rule E. See, e.g., Incas, 747 F.2d at 964.

Second, Voyager argues on various grounds that the counterclaims are frivolous. It is well established that countersecurity will not be awarded for counterclaims that are blatantly without merit; this rule is a corollary of the proposition that courts should exercise their discretion so as to avoid imposing unnecessary and burdensome obstacles to plaintiffs' seeking security for maritime claims. Finecom Shipping, Ltd. v. Multi Trade Enters. AG, No. 05 Civ. 6695, 2005 WL 2838611, at *1 (S.D.N.Y. Oct. 25, 2005); Starboard Venture Shipping, Inc. v. Casinomar Transp., Inc., No. 93 Civ. 644, 1993 WL 464686, at *6 (S.D.N.Y. Nov. 9, 1993). However, courts need to be cautious in addressing the merits of such disputes at the very preliminary stage of litigation at which security and countersecurity issues typically arise:

> [C]ourts should be reluctant to prejudge the merits of claims based
> essentially on the pleadings and a sparse record consisting of a few
> documents, in advance of any discovery. This is particularly so
> when the ultimate merits will be decided not by this Court, but by
> an arbitration panel in another country.

Finecom, 2005 WL 2838611, at *1. Accordingly, the inquiry into the merits of the claims is "severely limited." Front Carriers, Ltd. v. Transfield ER Cape, Ltd., No. 07 Civ. 6333, 2007 WL 4115992, at *2 (S.D.N.Y. Nov. 19, 2007).

Voyager is thus wrong to contend that in order to obtain countersecurity, a counterclaiming party needs to support its claims with evidence. "[A]t least where the parties

4

have not engaged in any discovery and the Court has only a sparse record to review," the fact that a well-pleaded counterclaim is not supported with evidence is not an obstacle to a requirement of countersecurity. Front Carriers, 2007 WL 4115992, at *3. Nor is it persuasive that Voyager has produced an opinion of an English solicitor that Hanjin will not prevail on its claims. That an expert, through legal analysis, concludes that a claimant is unlikely to succeed in litigation does not indicate that the claim is frivolous; in any event, Hanjin unsurprisingly has submitted a contrary opinion by its English solicitor.

Voyager also submits that the claims on which the demand for security are based can be found to be frivolous because Hanjin suspiciously delayed in making those claims. As Voyager points out, Hanjin has failed, as of yet, to advance those claims in the English arbitration or in the South African action, going so far as to represent to the South African court that its claims there were based on a "complete reconciliation" of the parties' respective obligations under the charter party. Voyager argues that for Hanjin to devise new claims arising from the same charter party now, after Voyager obtained an attachment on its own claims, suggests a merely retaliatory concoction of claims, and should be prohibited by concepts of waiver and estoppel.

But the waiver and estoppel arguments are not well taken. Neither the arbitration nor the arrest of the vessel in South Africa have proceeded to a final judgment on the merits that would give rise to collateral estoppel of claims that could or should have been brought in those forums. Voyager offers no persuasive basis for believing that Hanjin is precluded from making the claims asserted here in either of those litigations. While Hanjin's belated discovery of speed and over-consumption claims on two voyages, after it had supposedly made a "complete reconciliation" of accounts and determined only to assert such claims with respect to other

5

voyages entirely, raises some skepticism, it is hardly outside the common experience that during the course of litigation new claims are made, or records are viewed in a different light as a result of repeated intense scrutiny, even apart from the discovery of new evidence. Moreover, Voyager appears to be wrong that Hanjin failed to assert these claims until after it was facing the attachment action in New York. Hanjin apparently notified Voyager of its new claims in October and November 2007 (Declaration of Ian Renford Hawkes, dated Jan. 31, 2008, ¶ 4), while Voyager's action was not filed in this Court until December 2007. In any case, skepticism about a claim's merits or mere suspicions about a party's motives are not sufficient to conclude that the claims are frivolous or asserted purely for harassment. Hanjin's counterclaims are well-pleaded and based on plausible if debatable legal theories. That is sufficient to hurdle the frivolity bar and support a demand for countersecurity.

Countersecurity thus should be awarded in this case. The parties dispute two additional collateral issues. First, Voyager asks that the award of countersecurity be limited to $242,075.85, the amount that it has succeeded in attaching pursuant to this Court's order. Hanjin responds that Rule E contains no such limitation, and seeks an award in the full amount of its claims. Courts in this district have sometimes limited countersecurity to the amount of the security obtained by the plaintiff, and sometimes refused to do so. Compare Clipper Shipping Lines, Ltd. v. Global Transporte Oceanico S.A., No. 06 Civ. 15299, 2007 WL 646329, at *2 (S.D.N.Y. Feb. 26, 2007) (limiting countersecurity); Finecom, 2005 WL 2838611, at *2 (same); with Pancoast Trading S.A. v. Eurograni S.r.l., No. 07 Civ. 8581, 2008 WL 190376, at *1 (S.D.N.Y. Jan. 22, 2008) (refusing to limit countersecurity). These cases do not reflect different views of the law, but rather are rooted in the essentially discretionary and fact-bound nature of

6

countersecurity orders.

There is certainly no general principle of law limiting an award of countersecurity to the amount originally attached. Such an absolute rule would be a travesty, not an application, of the rule that awards of countersecurity aim to place the parties on an "even footing." As Hanjin rightly points out, if after a collision between two vessels, the owner that suffered only minor damages reaches the courthouse first, limiting the party with much greater damages to equal countersecurity hardly puts the parties on an equal footing: the claims of one are fully secured, while the other's remain mostly unsecured, unfairly giving considerable leverage to the fully secured party. (D. Reply at 18-19, quoting 7A Moore's Federal Practice § E.15 at E-737 (2d Ed. 1988).) This Court has recognized this principle in prior litigation, noting that "[a] party with a small claim should not be enabled to defeat full security for a counterparty's larger claim simply by winning the race to the courthouse." Pancoast, 2008 WL 190376, at *1. On the other hand, there are situations in which awarding disproportionate amounts of security to the counterclaimant will itself unbalance the parties' strengths.

This appears to be one such case. First, Hanjin already has obtained considerable security via the South African litigation through a letter of undertaking for $389,546.23. Moreover, these fully-secured claims are apparently the only ones thus far actually asserted in the London arbitration in which the parties actually plan to resolve their differences. Although Hanjin has notified Voyager of these claims (Hawkes Decl. ¶ 4), and "reserves the right to pursue" them in the London arbitration (Answer & Counterclaim, ¶ 36), apparently it has not yet done so. While the Court has rejected Voyager's contention that Hanjin's belatedly-asserted claims are frivolous, the factors suggesting that these claims are less than potent counsel against

allowing Hanjin to use them to achieve a position of additional strength as against Voyager by achieving a counter-attachment that, taken together with the letter of undertaking already obtained via the arrest of the vessel, would leave it with much greater security than Voyager holds. Finally, this is not a case like the hypothetical posited by Hanjin in which one party demonstrably has much larger damages from an event that presents fair ground for litigation over who is at fault. Hanjin's and Voyager's claims are not in such vast disproportion that the failure to award full countersecurity places Hanjin at a disadvantage in the litigation. Limiting the countersecurity here appears the fairer course.

Second, Hanjin argues that if Voyager fails to post countersecurity as required, the Court should enjoin Voyager from proceeding with its claims in the London arbitration. Hanjin's argument is rooted in the language of Rule E(7)(a), which provides that "[p]roceedings on the original claim must be stayed until [counter]security is given unless the court directs otherwise." As Hanjin notes, merely staying the instant litigation provides no real remedy, since neither Voyager nor Hanjin has any intention of litigating the merits of the action in this proceeding. To stay this action, while allowing Voyager to retain the security obtained by attachment and to pursue the arbitration in London while defying the Court's order to post countersecurity, would give Voyager the benefit of its attachment while effectively depriving Hanjin of the equalizing remedy provided by Rule E. At the same time, however, there is a natural reluctance to interfere in a foreign proceeding by enjoining an arbitration that the parties have mutually agreed is the appropriate forum to resolve their disputes, in aid of a proceeding that is largely collateral to the proceedings in that forum.

There is no need to reach this issue at this time. The Court has every expectation that Voyager, having invoked the authority of this Court, will comply with its orders. Should the Court's confidence be misplaced, it should be noted that enjoining Voyager from pressing its arbitration claims is not the only, or necessarily the most appropriate, remedy available to the Court. Voyager came to this Court in the first place not to litigate the merits of its disputes with Hanjin, but to obtain security for the claims it is pressing in another forum. That security is available to Voyager only on the terms provided in the Admiralty Rules, including the requirement that the claimant post countersecurity if appropriate. The Court has inherent power to enforce its orders against parties who have thus sought its aid. Should Voyager fail to comply with the countersecurity requirement of Rule E, which is a condition of the availability of the attachment provided by Rule B, the Court retains the power to vacate its order of attachment, and will not hesitate to utilize that power if necessary.*

Accordingly, it is hereby ordered that Hanjin's motion for countersecurity is granted to the extent that Voyager is ordered to post countersecurity in the amount of $242,075.85, on or before February 22, 2008.

SO ORDERED.

Dated: New York, New York
     February 13, 2008

                                                             GERARD E. LYNCH
                                           United States District Judge

---

\* The Court is similarly confident that Hanjin would not have sought countersecurity if it did not intend actively to litigate its counterclaims. If it has no such intention, utilizing phantom counterclaims simply to obtain additional security would be an abuse of this Court's process. If Hanjin fails to pursue these claims promptly in the London arbitration, or to litigate them here, the countersecurity order will be vacated.

Ex. 4

## HIRE STATEMENT

| MOTORVESSEL: | SOUTHGATE | Jan/30/08 |
|---|---|---|
| OWNERS: | Zodiac Maritime Agencies Limited | |
| CHARTERERS: | INDUSTRIAL CARRIERS | C/P dd 23-Nov-07 |

| | | |
|---|---|---|
| DAILY HIRE: | $37,000.00 | |
| ADDRESS COMMISSION: | 3.75% | |
| BROKER COMMISSION: | | |

**CHARTER PERIOD / COMMISSION:**

| | | | | CURRENT TOTAL |
|---|---|---|---|---|
| ON HIRE: | | | | |
| From: Dec/3/07 23:05 Hrs. | To: Jan/29/08 19:42 Hrs. | | | |
| = 56.859028 Days | | @ US | $37,000.00 per day | $2,103,784.03 |
| BALLAST BONUS | | | | |
| Less ADDRESS COMMISSION: | | 3.75% | | ($78,762.97) |
| Less BROKER COMMISSION: | | 0.00% | | $0.00 |

**Off Hire See Schedule Page 2**

| | | | | |
|---|---|---|---|---|
| Off hire gross per day | Days | (3.696528) | Rate $  37,000.00 | ($136,771.53) |

**BUNKERS:**

| | | | | |
|---|---|---|---|---|
| ROB ON DELIVERY | IFO: MT | 591.700 $ | 500.00 p/MT | $295,850.00 |
| | MDO: MT | 54.800 $ | 800.00 p/MT | $43,840.00 |
| | MGO: MT | $ | p/MT | $0.00 |
| | | | | |
| ROB ON REDELIVERY | IFO: MT | 609.216 $ | (500.00) p/MT | ($304,608.00) |
| | MDO: MT | 74.677 $ | (800.00) p/MT | ($59,741.60) |
| | MGO: MT | $ | - p/MT | $0.00 |
| | | | | |
| LESS: OFF HIRE BUNKERS | | IFO | | $0.00 |
| SEE OFF HIRE SCHEDULE PAGE 2 | | MDO | | ($8,400.00) |
| | | MGO | | $0.00 |

**Miscellaneous**

| | | | |
|---|---|---|---|
| INTERMEDIATE HOLD CLEANING Holds: | | Amount/Hold: | $2,000.00 |
| IN LIEU OF HOLD CLEANING | | | $3,600.00 |
| CABLES/VICTUALLING/ENTERTAINMENT | L/S PER MONTH: $1,250.00 | | $2,336.67 |
| 2.5% disbursement commission | | | |

**LESS OWNERS EXPENSES:**

| | Actual | Estimated | |
|---|---|---|---|
| PORT | | | |
| PORT | | | |
| PORT | | | |
| PORT | | | |
| PORT | | | |
| | | | |
| TOTAL OWNERS' EXPENSES: | $ | | $0.00 |

**LESS REMITTANCES:**

| | | |
|---|---|---|
| DATE: Dec/4/07 | AMOUNT: | $874,602.50 |
| DATE: Dec/18/07 | AMOUNT: | $534,812.50 |
| DATE: Jan/22/08 | AMOUNT: | $37,654.09 |
| DATE: Jan/25/08 | AMOUNT: | $89,110.66 |
| DATE: Jan/29/08 | AMOUNT: | $31,197.40 |
| DATE: | AMOUNT: | |
| DATE: | AMOUNT: | |
| DATE: | AMOUNT: | |
| DATE: | AMOUNT: | |
| DATE: | AMOUNT: | |
| DATE: | AMOUNT: | |
| TOTAL REMITTANCES: | $1,567,277.15 | ($1,567,277.15) |

| **TOTAL DUE OWNERS:** | **$302,749.45** |
|---|---|